M.C., through RUBY CARTER,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　)　　　No. 4:07-CV-906 (CEJ)
　　　　　　　　　　　　　　　　)
MICHAEL J. ASTRUE,　　　　　　　)
Commissioner of Social Security, )
　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　)

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 22, 2005, plaintiff, through his mother, filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act Act, 42 U.S.C. §§ 1391 et seq. (Tr. 47). Plaintiff was thirteen years old at the time. (Tr. 47). Plaintiff was allegedly disabled due to hyperactivity, learning problems and behavioral problems. (Tr. 147). Plaintiff alleges that his disability began on June 1, 1998. Plaintiff's application was initially denied by defendant. (Tr. 39-43). Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on August 28, 2006. (Tr. 188-207). Plaintiff was represented by counsel and testified at the hearing. (Tr. 201). Plaintiff's mother also testified before the ALJ. (Tr. 191). On December 21, 2006, the ALJ found that plaintiff was not disabled and denied his claim for benefits. (Tr. 6-17). Plaintiff requested review of the ALJ's decision by the Appeals Council on

January 16, 2007. (Tr. 5). The Appeals Council denied plaintiff's request for review on April 5, 2007. (Tr. 2-4). Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. **Evidence Before the ALJ**

Plaintiff was born on April 22, 1992. (Tr. 47). He lived with his grandmother Ruby Carter until he was approximately six years of age, at which time he lived with his birth mother for two years. (Tr. 158). He was then placed in foster care until he again moved in with his grandmother in 2003. He was adopted by his grandmother in July 2004 and currently resides with her.[1] (Tr. 158). Plaintiff has eight siblings, but no other children live with plaintiff. (Tr. 133, 158).

At the time of the hearing, plaintiff testified that he was entering ninth grade. (Tr. 201). Plaintiff was placed in special education classes at school based on his alleged learning disability. (Tr. 198). Plaintiff does not participate in any extra-curricular activities. (Tr. 135). Plaintiff struggles with several academic subjects but, according to his mother, he has the most trouble with math and science. (Tr. 134). Plaintiff testified that he enjoys math and science most. (Tr. 201). Plaintiff's mother claims that plaintiff routinely caused interruptions in his

---

[1]The medical and school records in this matter refer to Ms. Carter as plaintiff's mother in some instances and his grandmother in other instances. Recognizing plaintiff's legal adoption, the Court will refer to Ms. Carter as plaintiff's mother.

classes, but she testified that plaintiff's behavior at school had improved. (Tr. 134, 197). She also claimed that plaintiff was frequently involved in fights with his peers and that he threatened to get a gun and "shoot shoot shoot". (Tr. 133). She testified that this behavior, too, has improved. (Tr. 197). Indeed, she testified that plaintiff had not gotten into any fights for "a couple years or so". (Tr. 197).

When asked to describe plaintiff's typical day, his mother explained that she has trouble waking plaintiff up each morning. (Tr. 133). She believed this was because plaintiff stays awake until 3:00 or 4:00 each morning. (Tr. 133). She claims that she then forces plaintiff to brush his teeth, but that plaintiff refuses to take a bath. (Tr. 133). She contends that, when plaintiff is upset, he will either vomit or urinate on himself. (Tr. 133).

During the day, unless he is at school, plaintiff passes time by playing video games and watching television. (Tr. 133). Plaintiff does not assist in household chores, other than taking out the trash every other day. (Tr. 135). Plaintiff's mother claims that plaintiff does not understand and follow directions and is very disrespectful towards others. (Tr. 135).

### III. Educational Records

Plaintiff was evaluated at school and was determined to have a learning disability that required special education. (Tr. 110). As noted in a reevaluation report dated May 17, 2002, plaintiff's special education program took him outside of his regular class for

21% to 60% of the time. (Tr. 110). Although plaintiff was in fourth grade at the time, his teacher estimated that his reading and math skills were at a second and third grade level, respectfully. (Tr. 111). It was noted that plaintiff generally followed school rules well and usually displayed respect for authority. (Tr. 111). Plaintiff sometimes appeared moody and unhappy. (Tr. 111).

An Individual Educational Program Services Plan was completed in March 2004 when plaintiff was in sixth grade. (Tr. 99). Plaintiff was receiving 1440 minutes of special education each week, which required him to be outside of his regular classroom more than sixty percent of the time. (Tr. 99). Plaintiff's reading skills were close to a third grade level, although his reading comprehension skills remained on a second grade level. (Tr. 100-101). It was noted that plaintiff had difficulty focusing and was easily frustrated. (Tr. 100). Socially, plaintiff was noted to be a "friendly" student who got along well with his peers. (Tr. 100). Plaintiff turned in homework on time and had a good attendance record. (Tr. 100).

In February 2005, the school psychologist noted that plaintiff "continues to display moderate behavior concerns regarding following rules, adult authority and peer relationships. (Tr. 83). An Individual Educational Program Services Plan was completed in April 2005 and noted that plaintiff was the best reader in his class of seven. (Tr. 58). It noted that plaintiff scored in the lower eighth percentile on the national Terra Nova achievement

test. (Tr. 58). The report indicated that plaintiff is one of the "best" in the class when we participates, but that his "moody personality" impedes his learning ability. (Tr. 58).

A teacher questionnaire completed by plaintiff's special education teacher on May 3, 2005, indicates that plaintiff remained in a self contained class more than sixty percent of the time. (Tr. 88). Plaintiff was in seventh grade at the time and received instruction at the seventh grade level in reading, at the fourth grade level in Math, and at the fifth grade level in written language skills. (Tr. 88). Plaintiff's teacher indicated that plaintiff had a "serious problem" with comprehending and performing math problems, understanding class discussions, applying previously learned material and applying problem-solving skills. (Tr. 89). Plaintiff also displayed serious problems with refocusing to task, changing from one activity to another without being disruptive, organizing school materials, completing homework assignments; working at a reasonable pace without distracting others and completing such work accurately. (Tr. 90). Plaintiff's teacher noted that plaintiff's eyesight was poor and that he needed glasses. (Tr. 94). He also indicated that plaintiff often slept in class. (Tr. 95).

Plaintiff received several "D" and "F" grades on his seventh grade report card, although his grades improved throughout the year. (Tr. 85). By the fourth quarter of his seventh grade year, plaintiff received three "D" grades, two "C" grades, and five "B" grades.

## IV. **Medical Records**

Plaintiff presented to the Forest Park Medical Clinic on June 3, 2005 for a psychological examination. (Tr. 157-163). Plaintiff was examined by L. Lynn Mades, Ph.D. (Tr. 162). During the session with Dr. Mades, plaintiff denied any problems at home or with his teachers. (Tr. 157). Dr. Mades noted that plaintiff was not currently being treated for any psychological condition and did not have any history of treatment by a mental health professional. (Tr. 158). Plaintiff was described by Dr. Mades as well-groomed with hygiene and general appearance within normal limits. (Tr. 159). Plaintiff was cooperative throughout the examination. (Tr. 159). His mood was described as euthymic. (Tr. 159).

Plaintiff was administered a Weschler Intelligence Scale for Children ("WISC-IV") to ascertain his level of intellectual functioning. (Tr. 160). Plaintiff obtained a verbal comprehension score of 71, a perceptual reasoning index IQ of 73, a working memory index of 86, a processing speed index of 103 and a full scale IQ of 76. (Tr. 160). Dr. Mades noted that "these results place [plaintiff] in the borderline range of cognitive functioning overall." (Tr. 160).

Dr. Mades diagnosed plaintiff with borderline intellectual functioning. (Tr. 161). Based on the history provided by plaintiff and his mother, Dr. Mades also indicated that plaintiff had a learning disorder, not otherwise specified. (Tr. 161). Dr.

Mades assigned plaintiff a GAF[2] score in the 70-75 range.[3]   Dr.
Mades noted that, even though some of plaintiff's test scores fell
into the borderline to average range, plaintiff was still
classified as "mentally retarded" by the school district.   (Tr.
161).   Dr. Mades felt that school activity would be mildly to
moderately affected by plaintiff's learning impairment, but
believed that plaintiff's prognosis was fair to good.   (Tr. 162).

A childhood disability evaluation form was completed by Nalini
Mehta, M.D. and Terry L. Dunn, Ph.D. on June 10, 2005. (Tr. 123).
Plaintiff was assessed as having a less than marked limitation in
each of the following areas: (1) acquiring and using information;
(2) attending and completing tasks; (3)interacting and relating
with others; (3)caring for himself; and (4) his health and physical
well-being. (Tr. 125).   No limitations were noted in plaintiff's
ability to move about and manipulate objects. (Tr. 125).   The
report indicated that plaintiff's vision had decreased and that
corrective glasses were necessary. (Tr. 127).   Plaintiff's
allegations were deemed "partially credible".  (Tr. 127).

_____

[2]The GAF is determined on a scale of  1 to 100 and reflects
the clinician's judgment of an individual's overall level of
functioning, taking into consideration psychological, social, and
occupational functioning.  Impairment in functioning due to
physical or environmental limitations are not considered.
American Psychiatric Association, Diagnostic & Statistical Manual
of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th
ed. 2000).

[3]A GAF score of 71 to 80 applies when there is no more than
a slight impairment in social, occupational, or school
functioning.  Symptoms are transient and expectable (trouble
concentrating after family argument, etc).  See Am. Psychiatric
Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34
(4th ed. text rev. 2000).

An admission form filled out on August 25, 2005, indicates that plaintiff's learning ability was substantially impaired. (Tr. 177). The form indicated that plaintiff did not exhibit substantial impairment in his ability to function in social relationships or self care. (Tr. 177). Plaintiff's diagnosis was ADHD, not otherwise specified, brief psychotic disorder and mental retardation, severity unspecified. (Tr. 178). Plaintiff's GAF was assessed at 42.[4] (Tr. 179).

A progress note dated September 24, 2005 from Patrick Oruwari, M.D. at the Hopewell Center indicated that plaintiff's diagnosis was Attention Deficit Hyperactivity Disorder ("ADHD")[5], psychosis not otherwise specified[6], Asperger disorder[7] and mild mental retardation. (Tr. 171). Plaintiff's GAF remained at 42. (Tr. 171). Plaintiff's mother claimed that plaintiff did not eat or sleep regularly and that he talked to himself. (Tr. 170). She

---

[4]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

[5]ADHD is a disorder characterized by "a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, (4th ed. 2000).

[6]Psychosis refers to a mental and behavioral disorder causing gross distortion of a person's mental capacity and their ability to recognize reality. <u>See</u> <u>PDR Medical Dictionary</u> 1478 (2d ed. 2000).

[7]Asperger Disorder refers to development characterized by severe and enduring impairments in social skills. <u>See</u> <u>PDR Medical Dictionary</u> 525 (2d ed. 2000).

described plaintiff's behavior as childish and hyperactive. (Tr. 170). She explained that on one occasion, he killed a bug but repeatedly returned to hit the bug again, saying things such as "You ain't dead yet?". (Tr. 170). Plaintiff's insight and judgment were both described as poor. (Tr. 171). Dr. Oruwari prescribed plaintiff Risperdal[8] twice per day. (Tr. 171).

A Hopewell Center progress note dated November 8, 2005 indicated that plaintiff's mother received a phone call from plaintiff's school regarding his behavior. (Tr. 168). Plaintiff's mother stated that the school told her plaintiff talked during class and acted out. (Tr. 168). Plaintiff's sleep had improved with his medication and he reported no complaints. (Tr. 168). Plaintiff acknowledged that he was not always compliant with his medication. (Tr. 168). Plaintiff's insight and judgment were described as fair. (Tr. 168). Plaintiff's GAF was assessed at 50. (Tr. 168). Plaintiff's diagnosis was ADHD, rule out major depressive disorder. (Tr. 168).

On December 27, 2005, plaintiff presented to the Hopewell Center for medication after missing his prior appointment. (Tr. 167). He reported that, when on medication, "he did better". (Tr. 167). He explained that he got into trouble at school but he had not been on his medication at the time. (Tr. 167). Plaintiff reported no problems with his eating or sleeping while on

---

[8]Risperdal is the brand name for Risperidone and is indicated for the treatment of schizophrenia and acute manic or mixed episodes associated with bipolar I disorder. See Phys. Desk Ref. 1677 (61st ed. 2007).

medication, and stated that his ability to focus and concentrate had improved. (Tr. 167). Plaintiff's diagnosis was AHDH and psychosis not otherwise specified. (Tr. 167). His GAF remained at 50. (Tr. 167). Plaintiff was provided with additional prescriptions for Concerta, Risperdal and Prozac.[9] (Tr. 167).

Treatment records from the Hopewell Center dated February 22, 2006 indicated that plaintiff's GAF was 55 at that time.[10] (Tr. 166). Plaintiff had missed his last appointment and had run out of medication. (Tr. 166). Plaintiff reiterated that the medicine helped him focus better in school. (Tr. 166). His insight and judgment were regarded as fair. (Tr. 166). Plaintiff's diagnosis remained ADHD and psychosis. (Tr. 166). He remained on his medication. (Tr. 166).

Plaintiff presented to the Hopewell Center on April 19, 2006 for medication. (Tr. 181). He had not picked up his medication for the prior month and had not taken any medication for two weeks. (Tr. 181). Nevertheless, there were no major complaints reported. (Tr. 181). Plaintiff's mother stated that plaintiff was doing "okay." (Tr. 181). Plaintiff still reported hearing voices at

---

[9]Prozac is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[10]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

-10-

night. (Tr. 181). Plaintiff's insight and judgment were fair and his mood was fine. (Tr. 181). His diagnosis continued to be ADHD and psychosis not otherwise specified. (Tr. 181). Plaintiff was assigned a GAF of 50. (Tr. 181).

A Hopewell Center progress note dated July 25, 2006 indicated that plaintiff again missed his last appointment. (Tr. 187). He had run out of Concerta. (Tr. 187). Plaintiff indicated that he was not sleeping and was "feeling down". (Tr. 187). His insight and judgment were described as fair. (Tr. 187). His GAF remained at 50. (Tr. 187).

Hopewell Center treatment notes from August 22, 2006 indicate that plaintiff's GAF had improved to 55. (Tr. 186). Plaintiff had started taking his medications again. (Tr. 186). He still heard voices at night, but they now mostly told him to go to sleep. (Tr. 186). Plaintiff denied symptoms of depression but was still hyperactive. (Tr. 186). His insight and judgment were good. (Tr. 186). His diagnosis was psychosis not otherwise specified and ADHD. (Tr. 186).

Dr. Oruwari completed a child functional assessment form on October 14, 2006. (Tr. 183-85). He indicated that plaintiff had a marked limitation in the ability to acquire and use information and an extreme limitation in the ability to attend to and complete tasks. (Tr. 183-85). Dr. Oruwari felt that plaintiff had a moderate limitation in his ability to interact and relate with others. (Tr. 185). Dr. Oruwari found no evidence of limitations in any other functional domain. (Tr. 183-85).

## V. The ALJ's Decision

The ALJ made the following findings:

1. The claimant was born on April 22, 1992, and is a child under the age of 18, currently 14 years old.

2. The claimant has never performed substantial gainful activity.

3. The claimant has learning disorder, not otherwise specified, by history; borderline intellectual functioning; attention deficit hyperactivity disorder (AHDH); and psychosis, not otherwise specified, which are "severe" within the meaning of 20 C.F.R. § 416.924(c).

4. The claimant's impairments are not of a severity which medically meets or equals the severity of any impairment listed in Part B of Appendix 1 to Subpart P, 20 C.F.R. Part 404 ("Listing of Impairments"). Neither are the claimant's impairments functionally equivalent in severity to any listed impairment.

5. The claimant does not have "marked" limitations in two functional domains or "extreme" limitations in one functional domain.

6. Subjective complaints are considered credible only to the extent that they are supported by the evidence of record as summarized in the text of this decision.

7. The claimant is not under a disability as defined in the Social Security Act and derivative regulations.

## VI. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An

-12-

individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

When plaintiff is a child under the age of eighteen, a three step sequential process is used in evaluating whether that child is disabled under the Act. <u>See</u> 20 C.F.R. § 416.924. "The first step requires a determination of whether the child is engaged in substantial gainful activity. <u>Pepper ex rel. Gardner v. Barnhart</u>, 342 F.3d 853, 854 (8th Cir. 2003). If not, then the ALJ must make a determination of whether the child's impairments are severe. <u>Id.</u> The final step requires a "determination of whether the child's impairments are medically or functionally equal in severity to the listed impairments set forth in the Commissioner's disability regulations, 20 C.F.R. § 404, Subpart P, Appendix 1." <u>Id.</u>

Under this third step, a child's impairment is functionally equal to a listed impairment where there "is an 'extreme' limitation in one of six specific functional domains, or a 'marked' limitation in at least two domains." <u>Id.</u> The domains of functioning include: 1) Acquiring and using information; 2) Attending and completing tasks; 3) Interacting and relating with others; 4) Moving about and manipulating objects; 5) Caring for yourself and others; and 6) Health and physical well being. <u>See</u> 20 C.F.R. § 416.926a(b)(1).

**A.  Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   the ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.   third-party corroboration of the plaintiff's impairments; and

6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.    Plaintiff's Allegations of Error**

Plaintiff contends that the ALJ failed to properly consider functional equivalence under the third step of the sequential evaluation. Plaintiff claims that the ALJ's conclusion that plaintiff did not have a marked degree of impairment in at least two of the six functional domains is not supported by the medical evidence. Indeed, plaintiff believes that the ALJ improperly discounted the opinion of plaintiff's treating physician in making this determination and did not fully and fairly consider the record.

The ALJ found that plaintiff has a learning disorder, borderline intellectual functioning, ADHD, and psychosis. (Tr. 13). The ALJ noted that these impairments were severe within the meaning of 20 C.F.R. § 416.924(c). The ALJ concluded that the impairments did not, however, meet or equal in severity the criteria for any listed impairment. (Tr. 13).

The ALJ then proceeded to discuss each of the six functional domains to determine whether plaintiff suffered from marked limitations in at least two of the domains or extreme limitations

in at least one domain. (Tr. 14-16). The ALJ found that plaintiff had less than marked limitations in all but one domain. (Tr. 14-16). The ALJ concluded that the record supported a finding of a marked limitation only in plaintiff's ability to attend to and complete tasks. (Tr. 14-15). Accordingly, the ALJ found that plaintiff did not have an impairment that was functionally equivalent in severity to any listed impairment. (Tr. 17).

Plaintiff contends that the ALJ erroneously found that plaintiff has only a less than marked limitation in acquiring and using information. Plaintiff argues that, in doing so, the ALJ erroneously discounted the medical opinion of plaintiff's treating physician.

"A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). An ALJ may discount or disregard the opinion of a treating physician "where other medical assessments are supported by better or more thorough medical evidence." Id. at 920-21.

Dr. Oruwari, plaintiff's treating physician, indicated on a functional assessment form in October 2006 that plaintiff had a marked limitation in the domain of acquiring and using information. (Tr. 180). "The domain of acquiring and using information pertains to how well a child acquires, learns, and uses information." England v. Astrue, 490 F.3d 1017, 1020 (8th Cir. 2007). A marked limitation is present "when the impairment interferes seriously with the child's ability to independently initiate, sustain or

complete activities." Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 651 (8th Cir. 2004). A marked limitation is less than an extreme limitation. Id. "For purposes of comparison, a child will be found to have an 'extreme' limitation when the impairment interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." Id.

The ALJ discounted Dr. Oruwari's opinion that plaintiff had a marked limitation in this area for several reasons. First, the ALJ considered the opinion of the consultative physician that plaintiff's school activities would only be "mildly to moderately" affected by his impairment. The ALJ found this conclusion more consistent with plaintiff's intellectual testing results than Dr. Oruwari's opinion. Additionally, the ALJ noted that the school records did not indicate that plaintiff was "very seriously" limited in the domain of acquiring and using information.

The Court first examines the ALJ's finding that the school records support the conclusion that plaintiff has a less than marked limitation in the domain of acquiring and using information. Plaintiff's special education teacher, Mr. Hodges, indicated that plaintiff had obvious and severe problems in acquiring and using information.[11] (Tr. 89). Specifically, Mr. Hodges believed that

---

[11]The form filled out by plaintiff's special education teacher, Mr. Hodges, asked him to rate plaintiff's various skills within each domain on a five point scale: (1) no problem; (2) a slight problem; (3) an obvious problem; (4) a serious problem; and (5) a very serious problem. (Tr. 89). Mr. Hodges selected several three and four ratings, but did not give a rating of five to any of the skills in any domain. (Tr. 89-93).

plaintiff had serious problems with comprehending math problems, understanding class discussions, recalling previously learned material, and applying problem-solving skills in class discussions. (Tr. 89). Mr. Hodges also indicated that plaintiff had an obvious problem with comprehending oral instructions, understanding school and content vocabulary, providing organized oral explanations, expressing ideas in written form, and learning new material. (Tr. 89).

The ALJ acknowledged these records, but noted that Mr. Hodges did not indicate that plaintiff had a "very serious" problem in any area within the domain. Thus, the ALJ appears to equate the lack of a "very serious" problem in the school report to a less than marked limitation. However, in his subsequent finding that plaintiff did possess a marked limitation in the domain of attending and completing tasks, the ALJ relied on the same school records, which again indicated that plaintiff possessed obvious and serious problems, but not "very serious" problems. (Tr. 14-15). It is unclear to the Court how an assessment of "obvious and serious problems" in one functional domain can support a conclusion of markedly limited function, while identical ratings in a second functional domain purportedly support a conclusion that plaintiff is not markedly limited. Thus, the Court finds that the school records do not contradict Dr. Oruwari's opinion that plaintiff is markedly limited in the domain of acquiring and using information.

Even though the Court believes that the school records, at least to some degree, support Dr. Oruwari's opinion that plaintiff

suffers a marked limitation in this domain, the Court must still affirm the ALJ's decision if it is supported by substantial evidence, even if substantial evidence also supports a contrary outcome. See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001).

In this case, upon a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's conclusion that plaintiff was less than markedly limited in the domain of acquiring and using information. As noted by the ALJ, Dr. Oruwari's treatment notes indicate that plaintiff's condition improved through medication treatment. (Tr. 166-168). Plaintiff admitted that, with medication, he was better able to focus in school. (Tr. 166). Indeed, subsequent to treatment, plaintiff was consistently provided a GAF score between 50 and 55, an improvement over his pre-medicated GAF scores. (Tr. 166-68, 171, 181, 186-87). Plaintiff's condition improved despite his repeated failure to attend his appointments and take his medicine as directed. (Tr. 166-68, 181, 187). The medical records show that plaintiff's treatment was effective and do not support Dr. Oruwari's conclusion that plaintiff retained a marked limitation in his ability to acquire and use information.

Instead, the ALJ properly found that the evidence more closely supported the medical opinion of plaintiff's consultative physician, Dr. Mades. Dr. Mades assigned plaintiff a GAF score between 70 and 75, indicating that plaintiff would have no more than a slight impairment in school functioning with only transient

-19-

symptoms. (Tr. 161). Dr. Mades's conclusion is supported by plaintiff's standardized test scores. Under 20 C.F.R. § 416.926a(e)(2)(iii), test scores two standard deviations or more below the mean on a comprehensive standardized test is evidence of a marked limitation. On the WISC-IV, the testing mean is a score of 100 with a standard deviation of 15. See England, 490 F.3d at 1021 n.5. Thus, under the regulations, a score on the WISC-IV below 70 would be evidence of a marked limitation. Plaintiff exceeded this mark, attaining WISC-IV scores ranging from 71 through 103 and a full scale IQ of 76, placing him within the borderline range of cognitive functioning. (Tr. 160). Additionally, several of plaintiff's grades showed improvement throughout the school year. (Tr. 85). Plaintiff was given an average grade for his ability to read with understanding and with accuracy. (Tr. 85). His teacher identified him as the "best reader" in his special education class, and that his primary problem was staying focused. (Tr. 58). Substantial evidence supports the ALJ's conclusion that plaintiff's impairment is less than marked in the domain of acquiring and using information.

Plaintiff's remaining arguments have little merit. Plaintiff contends that the ALJ was required to recontact the treating physician tor additional information and argues that the record was not fully and fairly developed. An ALJ is "not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The Court does not believe that the ALJ had

a duty to seek additional information from Dr. Mades. Instead, the Court finds that the record was fully and fairly developed.

Substantial evidence supports the finding that plaintiff's impairments are not medically or functionally equal in severity to the listed impairments. Therefore, plaintiff is not disabled within the meaning of the Social Security Act and Regulations. <u>See</u> 20 C.F.R. § 416.924.

## VII. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his complaint [#1] and his brief in support of complaint [#15] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT COURT


Dated this 25th day of August, 2008.